UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROBIN WESLEY STEWART,          )
                                                )
        Plaintiff,           )
                                                )
        vs.               )         Case No. 4:16-CV-420 (CEJ)
                                                )
NANCY A. BERRYHILL[1],          )
Acting Commissioner of Social Security,  )
                                                )
        Defendant.        )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration (SSA).  The Court has reviewed the parties' briefs and the entire administrative record.

### I.  Procedural History

On June 7, 2010, plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits.  (Tr. 125).  The plaintiff also filed a Title XVI application for supplemental security income on June 23, 2010.  (Tr. 125). In both applications, plaintiff alleged disability beginning November 9, 2008.  (Tr. 125).  These claims were denied initially on August 30, 2010, and upon reconsideration on September 3, 2010.  (Tr. 125).  Thereafter, plaintiff filed a timely written request for hearing on September 20, 2010.  (Tr. 125).  In a hearing decision issued on October 17, 2011, plaintiff was found not disabled by an Administrative Law Judge (ALJ).  (Tr. 137).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

On March 5, 2013, plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits.  (Tr. 19).  The plaintiff also protectively filed a Title XVI application for supplemental security income on March 5, 2013.  (Tr. 19).  In both applications, the plaintiff alleged disability beginning January 27, 2012.  (Tr. 19).  These claims were initially denied on June 6, 2013.  Thereafter, the plaintiff filed a written request for hearing on June 13, 2013.  (Tr. 19).  The plaintiff appeared and testified at a hearing held on December 2, 2013.  (Tr. 19).  In a hearing decision issued on January 15, 2015, plaintiff was found not disabled by an ALJ.  (Tr. 30).  The Appeals Council denied plaintiff's request for review of the ALJ's decision on February 3, 2016.  (Tr. 1).

## II.    **Evidence Before the ALJ**

### A. **Prior Explanation of Determination**

#### 1.        **August 27, 2010**

On August 27, 2010, plaintiff was examined by Myra Belshe, a disability examiner for the Social Security Administration.  (Tr. 121).  Belshe noted that plaintiff was a forty-two-year-old with ten years of education alleging disability due to depression and a rash.  Belshe reviewed reports from Phelps County Regional Medical Center, Hugh Schuetz, and Community Care Clinic.  Belshe determined that plaintiff retained the ability to perform work such as a cleaner/preparer, odd-piece checker, laundry worker, and domestic.

### B. **Application Summary**

#### 1.        **Disability Report – Field Office**

In a Disability Report dated March 11, 2013, plaintiff alleged a disability onset date of January 27, 2012.  (Tr. 263-274).    Plaintiff stated that he suffered from depression, bipolar disorder, carpal tunnel, and degenerative osteoarthritis.

- 2 -

Plaintiff reported that he stopped working on November 11, 2009 when he was laid off from his job, and he believed his condition became severe enough to keep him from working on January 27, 2012. Plaintiff had completed the ninth grade; he did not attend special education classes and he had never completed any specialized job training or vocational school. Plaintiff noted that he had received medical treatment for both physical and mental conditions and was taking a number of medications for depression, pain, sleep disorder, mood disorder and to relax his muscles.

### 2.   Function Report – Adult

On March 20, 2013, plaintiff completed a Function Report. (Tr. 275-285). When asked about his daily activities, plaintiff reported that he is in pain all day. His daily activities consisted of eating meals, watching television, and taking his medicine. Plaintiff noted that his condition impacts his sleep, but he did not explain how. Plaintiff also noted that his condition impacted his ability to dress and shave once a month, his ability to bathe and care for his hair three times a month, and his ability to feed himself and use the toilet daily. Plaintiff stated that he needed special reminders to take his medicine and to take care of his personal needs and grooming. Plaintiff stated that he was able to prepare full meals and he did so daily.

Plaintiff reported that he was able to mow the grass and do laundry for about one hour at a time. He stated that he never goes outside during the winter and only goes outside during the summer when he has to mow the lawn. Plaintiff had a valid driver's license but was unable to drive because of "DWI's." (Tr. 283). Plaintiff went shopping for about two hours each month. Plaintiff stated that he is

able to pay bills, count change, handle a savings account, and use a checkbook and money orders.  His ability to handle money had not changed since his condition began.

Plaintiff reported that his hobbies were watching television and working with his hands, but he no longer engages in them.  Plaintiff stated that he socializes with others once or twice a month at his home.  Plaintiff stated that he does not have any problems getting along with others.  Plaintiff also stated that since his condition began he gets angry faster, his hands hurt, and sometimes he does not want to be around other people. He reported that he needed to be reminded to go places and needed someone to accompany him.

When asked about his physical abilities, plaintiff stated that his condition affects his lifting, reaching, memory, and concentration.  Plaintiff could lift no more than five pounds and could walk for half a mile before needing to rest.  Plaintiff was able to follow written instructions and to fully complete tasks.  Plaintiff stated that he can follow spoken instructions when he can comprehend what is being asked. He reported that he had problems with memory and concentration. Plaintiff also stated that he gets along well with authority figures and has never been fired for failing to get along with others.  He reportedly did not handle stress well but was able to adequately handle changes in routine.  Plaintiff concluded by stating that his hands and neck hurt constantly and that he feels worthless all of the time.

### 3.    **Function Report – Third Party**

A function report was completed by DeLaura Shipley, plaintiff's fiancée on March 23, 2013.  (Tr. 286).  Shipley lived with plaintiff and has known him for seven years.  She stated that plaintiff's activities included watching television,

- 4 -

playing computer games, walking around the block, and playing with the dog. Shipley stated that plaintiff used to cook but no longer wanted to do so since the onset of his condition.  His household chores consisted of mowing the lawn. Plaintiff also helped with shopping.

Shipley also noted that plaintiff's sleep was affected as he was "up and down all night." (Tr. 287).  He needed to be reminded to take his medications and to take care of his hair.  Shipley stated that plaintiff is able to pay bills, count change, and use a checkbook or money order, but he is slower handling money since the onset of his condition.

Shipley stated that plaintiff does not spend time with others and does not go anywhere regularly because he does not like to be around people.  (Tr. 290).  She also stated that plaintiff has trouble getting along with people and he gets very nervous, distant, and moody.

Shipley stated that plaintiff's condition impacts his ability to understand, use his hands, follow instructions, complete tasks, and get along with others, as well as his memory and his concentration.  She stated that plaintiff can follow written instructions but does better with spoken instructions.  Shipley also stated that plaintiff is usually able to get along with authority figures.   She noted that plaintiff had been fired or laid off from a job because of issues getting along with individuals because they were "being a smart ass" to plaintiff.  (Tr. 292).  Shipley also stated that plaintiff does not handle stress well but can adequately handle changes in routine.

Shipley stated that she had noticed unusual behavior or fears when plaintiff gets mad or moody.  She reported that plaintiff had wanted to "do himself in" on several occasions.  (Tr. 293).

### 4.      Work History Report

On April 4, 2013, plaintiff completed a work history report.   (Tr. 294).  Plaintiff worked as a laborer in a factory from 2004 to 2005, as a chop saw operator in a saw mill from 2005 to 2006, as a laborer in a factory from July 2007 to October 2008, as a temporary worker through a temporary service provider during 2008, and as a laborer at a factory in 2009.

### 5.      Disability Report – Appeals

In a June 21, 2013 disability report, plaintiff stated that his bipolar disorder and carpal tunnel had gotten worse.  (Tr. 314-325).  Plaintiff stated that he had no new physical or mental limitations, nor did he have any new illnesses, injuries, or conditions.  Plaintiff reported that he had been seen by Dr. Akbar Choudhary for carpal tunnel, degenerative osteoarthritis, and sleep apnea and was treated with therapy and medication.  Plaintiff also stated that he had been treated for bipolar disorder and given medication.

Plaintiff reported that he had been given sleeping medicine, medication for depression, a mood stabilizer, a muscle relaxer, and pain medication.  All of the medications caused drowsiness or dizziness.  Plaintiff also reported that he had not completed any type of special job training or any vocational rehabilitation, employment or other support services.

### 6.      Mental Residual Functional Capacity Assessment

On August 26, 2010, a Mental Residual Functional Capacity Assessment was conducted by Barbara Markway, Ph.D.  (Tr. 342-344).  Dr. Markway found that

- 6 -

plaintiff retained the ability to understand and remember simple instructions, that he could maintain adequate attendance, and that he could sustain an ordinary routine without special supervision.  She reported that plaintiff could interact adequately with peers and supervisors and that he could adapt to most changes common to a competitive work setting.

Dr. Markway also conducted a Psychiatric Review Technique on the same date.  (Tr. 345-355).  She noted that plaintiff suffered from depression and alcohol abuse.  Dr. Markway concluded that plaintiff required mild restriction of activities of daily living and no limitation related to repeated episodes of decompensation.  She further concluded that plaintiff required moderate limitations based upon difficulties in maintaining social functioning, as well as difficulties in maintaining concentration, persistence, or pace.

### 7.    Disability Determination Explanation

A Disability Determination Explanation was conducted by Sarah Jones, a disability adjudicator/examiner, on June 4, 2013.  (Tr. 148-161). Jones noted that plaintiff initially filed for disability due to depression, bipolar disorder, carpal tunnel and degenerative osteoarthritis and an inability to function and/or work as of January 27, 2012.  It was also noted that the plaintiff had not performed any work after the alleged onset date.   Jones reviewed evidence from Thomas Spencer, Psy.D, Midwest CES, Rolla Neurology Pain and Sleep, Community Care Clinic, and Phelps County Regional Medical Center, plaintiff's work history, and other evidence provided through the administrative process.

Jones reported that plaintiff had severe carpal tunnel syndrome, severe osteoarthrosis and allied disorders, severe affective disorders, and severe alcohol

and substance abuse disorders.  She found that plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two repeated episodes of decompensation – each of extended duration.  Jones found that plaintiff's statements were substantiated by the objective medical evidence and that his medically determinable impairments could reasonably be expected to produce pain.  In evaluating the plaintiff's residual functional capacity (RFC), Jones noted that plaintiff did have exertional limits and that plaintiff could occasionally lift and/or carry fifty pounds.  Jones further noted that plaintiff could stand or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and could push or pull for an unlimited amount of time.  Jones stated that plaintiff had an occasional posture limitation when climbing ladders, ropes, and scaffolds.  Jones also stated that plaintiff had limited right overhead manipulative limitations.  No visual or communicative limitations were found. In terms of environmental limitations, Jones found that plaintiff should avoid concentrated exposure to vibrations and hazards, such as machinery and heights.

Jones found that plaintiff had no understanding or memory limitations. His sustained concentration and persistence ability was not significantly limited, with the exception of the ability to carry out detailed instructions, which was determined to be moderately limited. Jones determined that plaintiff had limited ability to interact appropriately with the general public.    Jones concluded that plaintiff was not disabled.

### C. **Hearing Testimony**

#### 1.    **September 16, 2011**

At the hearing conducted on September 16, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.  (Tr. 82-119).  Plaintiff was 43 years old at the time of the hearing and had completed ninth grade.  Plaintiff had not been in special education classes but he mainly received Ds and Fs in school.  Plaintiff lived in a house with his fiancée and her fifteen-year-old daughter; plaintiff did not have any children of his own.

Plaintiff testified that the last time he worked was November 9, 2009.  From 1990 through 1995, plaintiff worked as an interior and exterior house painter, a job that required lifting up to 35 pounds.  Plaintiff also worked as a "band and brand picker," which involved taking bands out of charcoal and removing unburnt wood from kilns.  (Tr. 86).  After a number of absences, plaintiff stopped going to work altogether.  He testified that he believed he was going to be laid off "for missing so many days." (Tr. 87).  Plaintiff explained that his frequent absences were due to his inability to "deal with people" at work.  (Tr. 88).  However, he acknowledged that his job as house painter was mostly solitary work. Plaintiff worked as a line operator at a pipe factory for three years.  He testified that he was terminated after he turned down a promotion to senior line operator.  Plaintiff explained that he refused the job because he didn't feel that he could do it.

Plaintiff testified that he found it difficult to get out of bed at least three or four times a week.  On those days, he doesn't shower or take care of himself.  He does get up to eat because his medication has to be taken with food.

Plaintiff testified that he first sought treatment in 2010 after his fiancée found him with a gun in his mouth.  Plaintiff was admitted to a hospital for ninety-six hours but declined to be placed in a rehabilitation program.  Plaintiff stated that

he had been sober for more than a year, and that he went to Alcoholics Anonymous meetings once a week.  At the time of the hearing, plaintiff was taking Lithium, Celexa, and Vistaril for his mental health problems, and Percocet, Naproxen and Baclofen for his neck and back pain.  Plaintiff stated that when he takes Vistaril and Lithium, he can sleep for four to six hours.  However, he claimed he was unable to sleep six or seven times a month despite taking the medicines.  Plaintiff testified that he has a low energy level because the Lithium makes him feel sleepy and tired.  He also described hand tremors which his therapist believed to be a side effect of Lithium.  Plaintiff stated that, with the medication, his condition had improved since his suicide attempt in 2010, but he still had suicidal ideation.  He testified that he had developed a suicide plan but never acted on it.  Because of his suicidal urges he had to get rid of his guns.

Plaintiff stated that he first stopped drinking alcohol at age 16  but  resumed when he was 18.  At the time of his suicide attempt in 2010, plaintiff had been sober for three years.  However, he did drink on the day before the attempt.  Plaintiff stated that he had become irritable since he stopped drinking.

Plaintiff stated that, except for going to Alcoholics Anonymous meetings and doctor appointments, he rarely leaves his house.  He does chores around the house but does not do the dishes, vacuum, or make the bed.

Plaintiff reported having unprovoked crying episodes several times a week.  He also reported experiencing anxiety (particularly when in a crowd or in a small space), panic attacks, and difficulty concentrating.

When asked about his physical ailments, plaintiff stated that he had arthritis in  his  neck  which  caused  frequent  pain  and  numbness  in  his  right  arm  and

sometimes in his left arm and hand.   The pain lasted for three or four hours and was not relieved by medication.   Because of the numbness in his hands, plaintiff stated that he would be unable to grasp large or small objects.   Plaintiff testified that he was able to use a computer for no more than 20 minutes at a time because he experiences pain in the center of his shoulders which travels down both arms, primarily his right.   However, he was able to sit for long periods of time and stand without experiencing pain.

Although plaintiff had been diagnosed with carpal tunnel syndrome, he testified that his doctor had not recommended surgery because his condition was not severe enough.   Plaintiff also stated that he gets headaches and that he is legally blind in his left eye.   Plaintiff stated that he lost his driver's license 12 years earlier due to driving while under the influence and that he had not tried to get his driving privileges restored.

Also present at the hearing were Dr. Khushalani, a board certified psychiatrist, and Dr. McGowan, a vocational expert.   Dr. Khushalani had not personally examined the plaintiff but had read the medical data furnished by the ALJ.   Dr. Khushalani noted that plaintiff had been treated primarily at a community clinic for the previous three years and was diagnosed as having depression and alcohol abuse in August 2010.   He also noted an episode in 2010, when plaintiff drank alcohol, had suicidal ideations, and was briefly hospitalized, after being unable to obtain his anti-depression medicine.   Dr. Khushalani stated that plaintiff was subsequently diagnosed as having a mood disorder, and was given a trial prescription of Lithium along with Celexa for depression, and Vistaril for his sleep problems.   Based on the medical records, it appeared to Dr. Khushalani that when

- 11 -

plaintiff is sober and taking his medications regularly, he is reasonably stabilized, and the regression that he had once was largely due to having stopped taking the medication and drinking. According to Dr. Khushalani, plaintiff appeared to be sober now and without alcohol he does reasonably well. Dr. Khushalani had reviewed Dr. Mendesa's assessment of plaintiff in which several marked parameters were noted: an inability to complete a normal workday, respond appropriately to changes in work setting, and ability to travel to unfamiliar places were all markedly limited. But, Dr. Khushalani did not see any supporting evidence to that effect. Dr. Khushalani believed that plaintiff suffered from a mood disorder, a medically determinable impairment that precisely satisfies the diagnostic criteria. Dr. Khushalani found that plaintiff's activities of daily living are moderately affected; his ability to maintain social function is moderately affected, and his ability to maintain concentration, persistence, or pace is mildly affected. Dr. Khushalani noted that plaintiff had had one episode of decompensation, but it was not of extended duration. In terms of functional limitations, Dr. Khushalani stated that plaintiff can understand and remember simple instructions, carry out simple instructions and has the ability to make judgments on simple, work-related decisions. Dr. Khushalani concluded that plaintiff had no limitations in these areas. He found that plaintiff had moderate limitations with regard to understanding and remembering complex instructions, carrying out complex instructions, his ability to make judgments on complex work-related decisions, interacting appropriately with the public, interacting appropriately with supervisors and coworkers, and responding appropriately to usual work situations and changes in routine work settings. In response to a question posed by plaintiff's attorney, Dr. Khushalani stated that an

increase in stress would not necessarily increase plaintiff's symptoms.  He added that while being placed in a new environment would create some anxiety, plaintiff should not have any major problems once he acclimates himself and as long as he takes his medications and avoids alcohol.

Dr. McGowan, the vocational expert, found that plaintiff's last job was as a painter and characterized the skill required as a medium in the Dictionary of Occupational Titles.  The ALJ then posed a hypothetical to Dr. McGowan to determine whether plaintiff could return to his past relevant work, assuming an individual based on plaintiff's age, education and past work experience that had to alternate between sitting and standing at will and had back pain.  The ALJ further posited that the individual could lift up to 20 pounds at a time and could not interact with any dangerous or moving equipment; furthermore the individual could not do any work requiring fine manipulation due to carpal tunnel.  Dr. McGowan testified that such an individual could not return to plaintiff's past relevant work or the painting job.  Dr. McGowan stated that the sitting and standing limitation in itself would eliminate plaintiff's past relevant work, and that the job required medium strength while the hypothetical posited an individual with light strength. The ALJ then added that the individual would need limited contact with the public and coworkers and a routine unskilled type of work.  Dr. McGowan opined that none of the plaintiff's skills would transfer to the light level.  According to Dr. McGowan, plaintiff could work as a surveillance systems monitor, a hand packager of plastic products, and an electrical equipment inspector.  Dr. McGowan noted that if plaintiff needed to miss work three days or more a month, he would be terminated from his job.

### 2.    __December 2, 2014__

At the time of the hearing on December 2, 2014, plaintiff was 46 years old and lived with his fiancée.  (Tr. 37-78).  Plaintiff lived in public housing and was on Medicaid.

Plaintiff testified the only work he had done since January 2012 was mowing a lawn; however he only did it one time and had to stop because of back pain and stinging in his hands  due to carpal tunnel.  Plaintiff repeated his earlier testimony about his work in a pipe factory, a charcoal company, and as a house painter.  He also described work he performed as a roofer, cleaning batteries, and cutting wood for wine and whiskey barrels.  Plaintiff had also worked for a building supply company, first as a driver; after he lost his driver's license, he made specialty windows and doors.

Plaintiff testified that he could not work because his back hurt and because his carpal tunnel was getting worse.  Plaintiff complained of daily lower back pain which was usually around a 6 out of 10 on a pain scale but sometimes increased to 8.  Plaintiff also described neck pain that was affected by cold weather and by "working" his arms.  (Tr. 52).  He also stated that he has pain in his hands and that his hands often go numb.  He testified to having pain in his elbow, shoulders and upper arms whenever he works for longer than an hour or an hour and a half.  Even when he is not active he has pain in his arms and in his legs around three or four times a week.

Plaintiff underwent reconstructive surgery after being hit with a tire iron.  The surgery involved placing titanium plates in his eye, nasal cavity, and chin.  Plaintiff stated that he has a visual impairment stemming from the incident.

Plaintiff testified that he had problems sleeping because he has sleep apnea and bipolar disorder.  The medication he took didn't help him sleep, and it caused him to feel depressed and worthless.  Plaintiff testified that he had bipolar disorder, which manifests itself in quick mood changes and an inability to sleep for as much as four days, and depression which makes him not want to get out of bed.  He also complained of problems with short- and long-term memory. He believed the medication he took made his memory worse.

Plaintiff stated that he no longer had hobbies; however he used to make wine.  During the day, plaintiff watches television and walks his dog.  He testified that the dog was recommended by his therapist as therapy to motivate him to get out of bed and not feel worthless.   Plaintiff typically went to bed between 9:30 and 10:00 p.m., but had trouble sleeping because of racing thoughts.  Plaintiff did not have any problems washing or bathing, although sometimes he lacks motivation. He uses a hand rail for assistance in getting up and down in the bathroom.

At home, plaintiff helped with the laundry and cooking.  His fiancée does the shopping and he does not go with her.  Plaintiff testified that he rarely left the house and he didn't have visitors. He did not like to be around crowds, even family, because they make him nervous and anxious.

Plaintiff was able to sit for as long as 45 minutes and was able to stand for as long as one hour.  He normally did not pick up anything heavier than 10 pounds because of pain in his neck and his fingers.  He had trouble bending at the waist because of pain resulting from back surgery.  He also had trouble holding onto

- 15 -

things.  Plaintiff also testified that squatting and kneeling were difficult because of pain.

Plaintiff testified that he attends Alcoholics Anonymous meetings once every week.  Because of pain in his hands plaintiff is able to use a computer for only ten minutes at a time.  Although mows the grass weekly during the summer, it takes him two hours to do it because he has to stop for breaks.

When asked about his past work experience, plaintiff responded that he spent twelve hours a day operating an extruder machine in a standing position. The job involved unloading lightweight pipes from the machine which sometimes required plaintiff to use a forklift.  Plaintiff also mentioned his work making windows and doors and as a roofer.  (Tr. 70-73).

The ALJ asked the vocational expert about the type of work that could be done by an individual who has the same educational background and work history and is the same age as plaintiff.  The expert was asked to further assume that the individual retained the capacity to occasionally lift 20 pounds, frequently lift 10 pounds, walk or stand six hours out of an eight hour day and sit for six hours out of an eight hour day.  The individual could occasionally climb, stoop, crouch, kneel, and crawl and would be limited to jobs that did not require constant, repetitive hand movements. Finally, the individual should avoid unprotected heights, hazardous moving machinery and would be limited to simple work with occasional interaction with the general public.  The vocational expert responded that this individual could not return to plaintiff's past work.  However, the individual could be a housekeeper or a laundry sorter.  The expert noted that the ALJ's constant, repetitive hand movements' assumption was not specifically addressed in the

Dictionary of Occupational Titles.  The expert noted that there were some jobs that were removed from her assessment because of that assumption.  (Tr. 73-75).

The ALJ then posed another hypothetical assuming an individual with the same age, educational background and work history as plaintiff, who would be limited to sedentary work, with only occasional handling, fingering, and feeling. The expert stated that the individual could not do the previously suggested jobs nor could he do other jobs because of the occasional handling and fingering limitation. The individual would be limited to simple work. The expert noted that the individual's educational level would preclude anything like a telephone job, and any other work would require more frequent handling and fingering activities.  (Tr. 75-76).

In response to questioning by plaintiff's counsel, the vocational expert testified that the limitation requiring that the individual be able to take two additional fifteen minute breaks per day would preclude the suggested jobs because it would be a special accommodation that would not be sustainable in a simple job. The expert concluded that such a limitation would eliminate any possible employment given the educational level, past work and the simple work assumption that was included in the hypothetical.  The expert also stated that an individual needing to miss more than six days of work a year would exceed the tolerance of most employers.  (Tr. 76-77).

**D. Medical Records**

**1. Akhtar Choudhary, M.D.**

In an examination on February 13, 2006, Dr. Akhtar Choudhary found that plaintiff had mild weakness in his hands.  Dr. Choudhary concluded his findings

were consistent with bilateral carpal tunnel.  (Tr. 465).  On November 10, 2010, plaintiff saw Dr. Choudhary complaining of right-sided neck pain radiating to the right arm.  Dr. Choudhary determined that there was normal anatomic alignment without evidence of fracture or lithesis.  (Tr. 367).

On September 8, 2011 and October 4, 2011, plaintiff visited Dr. Choudhary complaining of neck and back pain, sleep apnea, and hand numbness.  (Tr. 461-462).  Dr. Choudhary observed that plaintiff had neck pain radiating to his shoulder and that his pain was aggravated with arm movements.  (Tr. 461-462).  Dr. Choudhary noted that plaintiff's medication was helping him and that he was suffering no side effects.  Dr. Choudhary's treatment plan was for plaintiff to continue his current medication.  On October 10, 2011, plaintiff visited Dr. Choudhary for testing at the Rolla Neurology Pain and Sleep Center.  (Tr. 490).  Upon examination Dr. Choudhary noted that plaintiff had mild weakness in his hands and concluded that plaintiff's symptoms were consistent with bilateral carpal tunnel.

On November 7, 2011, January 2, 2012, January 30, 2012, February 27, 2012, and April 23, 2012, plaintiff visited Dr. Choudhary complaining of neck and back pain.  (Tr. 456-460).  In each instance, Dr. Choudhary observed that plaintiff had neck pain radiating to his shoulder and that his pain was aggravated by arm movements.  Dr. Choudhary also remarked that plaintiff's medication was helping him and that he was suffering no side effects.  Dr. Choudhary's treatment plan prescribed plaintiff continuing his current medication.

On February 7, 2013, plaintiff had a follow-up visit with Dr. Choudhary.  (Tr. 455).  It was noted that plaintiff's pain was aggravated with arm movements and

that plaintiff had back pain radiating to his legs which was aggravated with walking, standing, and bending.   Dr. Choudhary noted that plaintiff had numbness and weakness in his hands which was aggravated by holding things.   Dr. Choudhary's treatment plan continued plaintiff's current medication.

On March 6, 2013, Dr. Choudhary noted that plaintiff's pain radiated to his legs and was aggravated with walking, standing, and bending. (Tr. 454).   Dr. Choudhary further noted that plaintiff's neck pain radiated to his right arm.   Dr. Choudhary further stated that plaintiff had numbness and weakness in his hands which sometimes caused him to drop things.

On February 16, 2015, after the ALJ's decision in this matter, plaintiff again saw Dr. Choudhary,.   (Tr. 545-546).   Dr. Choudhary noted that plaintiff had a history of back and neck pain which extended to his arms and legs and that plaintiff described the pain as constant.   Dr. Choudhary also noted that plaintiff was on pain medication which could cause dizziness and drowsiness.

On February 16, 2015, n response to a questionnaire, Dr. Choudhary wrote that plaintiff could lift up to ten pounds constantly, twenty pounds frequently, and fifty pounds rarely.   (Tr. 547-549).   Dr. Choudhary stated that plaintiff could twist, stoop, and balance occasionally, and balance, crawl, and crouch frequently.   With respect to the use of hands and arms, Dr. Choudhary found that plaintiff had limitations with reaching, handling, and fingering.   Dr. Choudhary also determined that plaintiff could finger and feel constantly and could reach and handle objects frequently.   Dr. Choudhary stated that plaintiff could sit for two hours before needing to change positions, and could sit for at least six hours during an eight-hour workday.   Dr. Choudhary also determined that plaintiff could stand for one

hour at a time before needing to sit down or walk around, and could stand for up to four hours a day during an eight-hour work day.  Dr. Choudhary also stated that plaintiff would need to shift positions at will from sitting, standing, or walking.

Dr. Choudhary further stated that plaintiff would need to take unscheduled breaks during an eight-hour work day on a varied basis for between 10 and 15 minutes.  Dr. Choudhary stated that plaintiff's pain, paresthesia, numbness, and chronic fatigue would cause a need for breaks.   Dr. Choudhary also stated that plaintiff did not need to use a cane or assistive device.  Dr. Choudhary further stated that plaintiff did not need to elevate his legs with prolonged sitting or standing.   Dr. Choudhary concluded that ten percent of a typical eight-hour workday would be lost due to plaintiff's symptoms interfering with the attention and concentration needed to perform even simple work tasks.  Dr. Choudhary stated that plaintiff was capable of low stress work.  Dr. Choudhary also stated that plaintiff's impairments were likely to produce good and bad days, and on average plaintiff would miss two days of work a month due to his conditions.  When asked whether plaintiff's limitations had existed since at least January 27, 2012, Dr. Choudhary marked the box "no," and wrote "do not know."

## 2. **Phelps County Regional Medical Center**

On October 1, 2012, plaintiff was admitted to the Phelps County Regional Medical Center (PCRMC) emergency room because he was threatening to cut his wrists.  (Tr. 383).  Plaintiff stated that he was depressed and had been drinking. He was observed overnight and admitted to the Center for Psychiatric Service on October 2, 2012.  Plaintiff reported that he was unhappy with his medications so he had stopped taking them.  (Tr. 386).  While being interviewed, plaintiff stated that

he had mood swings with elevated moods lasting up to four days.  It was noted that plaintiff had previously been admitted to the PCRMC for posttraumatic stress disorder, depression and drug and alcohol abuse.   (Tr. 387).   When he was admitted on May 5, 2012, he had been making suicidal and homicidal statements and had stopped taking his medication.  He also reported a suicide attempt at age 18.  Plaintiff was found to be acutely psychotic at that admission.  (Tr. 401, 404).

Plaintiff was discharged from PCRMC on October 6, 2012.  The discharge report noted that he responded well to detoxification and medication, and did not show any side effects or drug interactions at the time of discharge.  (Tr. 391).  The report noted that plaintiff did not show any signs of withdrawal from alcohol or any other drug.

The record shows that plaintiff was evaluated regularly at PCRMC from October 7, 2010 to February 5, 2013.  (Tr. 369-375, 415-435).  At each visit, it was noted that plaintiff's appearance was neat and clean, he had normal psychomotor activity, normal speech volume, a coherent thought process, he was goal directed, displayed good eye contact, had a normal speech rate, was thinking logically, and had normal intellectual function.  Plaintiff exhibited "looseness of associations" on December 13, 2011, which he had not exhibited in any of his other psychological evaluations.  (Tr. 427).  Plaintiff reported hallucinations on February 5, 2013, however no such report appears in any of his other psychological evaluations.  (Tr. 415).  Plaintiff evinced flight of ideas on September 7, 2010, May 10, 2011, and March 2, 2012, but not in any of his other psychological evaluations. (Tr. 371, 378, 425).  Plaintiff reported suicidal ideation on September 13, 2011 and May 1, 2012, but did not in any of his other psychological evaluations. (Tr. 423, 429).

On March 4, 2014, plaintiff was seen by Christy Huff, a registered nurse.  (Tr. 529).  Plaintiff presented for treatment of bipolar and related disorder.  Plaintiff denied thoughts of suicide, homicide, hallucinations, or paranoia, as well as denying the use of drugs or alcohol.  Plaintiff reported that he was doing well, sleeping through the night when taking his medication, and that his mood was good.  Plaintiff also stated that he was attending Alcoholics Anonymous meetings every Friday.

On March 11, 2014, plaintiff was seen by David D. Seaton, Psy.D., upon a referral from Nurse Huff.  (Tr. 543).  Plaintiff reported that he had struggled with depression and bipolar disorder for the previous three to four years.  Plaintiff also reported a history of alcohol and marijuana use since the age of thirteen.  Plaintiff complained of back, neck, and hand pain ranging from 4.5/10 to 8/10.  Plaintiff acknowledged that he had self-medicated since he was a teenager, that he had a history of multiple psychiatric admissions, and he had experienced suicidal ideation.  Plaintiff denied any current suicidal ideation or plans.   Dr. Seaton made no diagnosis, but instructed plaintiff to follow up in two weeks.

On March 25, 2014, plaintiff was seen by Dr. Seaton for a therapy session.  (Tr. 542).  Plaintiff stated that he had had an episode of not sleeping which he attributed to racing thoughts.  Plaintiff stated that he had depressed feelings but had no suicidal ideation.  Plaintiff believed that his pain contributed to his depression and reported MRI findings of arthritis in the neck and degenerative disk disease.  Dr. Seaton and plaintiff discussed strategies to help with his sleep problems, depression, and pain.

On April 8, 2014, plaintiff was seen by Nurse Huff. (Tr. 527).  He denied thoughts of suicide, homicide, hallucinations, paranoia, and the use of drugs or alcohol.  Plaintiff reported that he was doing well, sleeping through the night when taking Ambien, and that his mood had been good.  Plaintiff had a therapy session with Dr. Seaton on that same date.  (Tr. 539).  Plaintiff stated that he was doing better with sleep and that his medication was helping.  Plaintiff stated that he consistently took his dog for a one-hour walk twice a day, and that he was constantly doing things around the house, like sweeping, mopping, or washing the dishes.  Plaintiff stated that during the summer he would mow his lawn once a week and would mow other people's lawns, if interested.   Pain management was discussed, as well as strategies to cope with the pain.  Dr.  Seaton emphasized that mowing lawns is a manual and back-intensive job and suggested that plaintiff look at other options as he ages.  Dr. Seaton and plaintiff discussed potential vocational rehabilitation programs.

On April 22, 2014, plaintiff told Dr. Seaton that he needed to find something to do in order to fight depression.  (Tr. 541).  Plaintiff noted that he tried to increase his exercise by walking his dog an extra quarter mile.  Plaintiff also stated that he kept himself busy by pulling weeds in his yard.  Plaintiff noted that he slept better as a result, even without his medication.  Plaintiff also stated that he avoided taking Ambien once every two or three days to avoid getting used to the drug.  Dr. Seaton concluded the session by discussing potential hobbies and job prospects with plaintiff.

On May 6, 2014, plaintiff was seen by Dr. Seaton for a therapy session.  (Tr. 540).  Plaintiff stated that things had been going pretty good, largely because his

family had a problem with bees and solving that problem had given him something

to do.  Plaintiff stated that he was trying to keep himself busy doing chores, since

previously  he  had  been  sitting  around  watching  television,  and  he  had  begun

advertising  his  availability  to  mow  lawns.    Plaintiff  stated  that  he  had  been

consistently going to Alcoholics Anonymous on Friday nights to fight the urge to

drink alcohol.  Plaintiff stated that boredom and stress lead to him thinking about

drinking.  Dr. Seaton noted that plaintiff had come up with a comprehensive list for

relapse prevention and had a plan in place to deal with the potential problem of

drinking.

On May 20, 2014, plaintiff reported to Dr. Seaton that he had experienced an

episode  in  which  he  could  not  sleep  because  his  mind  was  racing.    (Tr. 538).

Plaintiff also reported having pain the day after he had mowed three lawns.  Dr.

Seaton and plaintiff discussed the relationship between tension and pain, as well as

ways to mitigate the pain.

On June 5, 2014, plaintiff reported to Nurse Huff that his mood had been

stable and level for the most part.  (Tr. 526).  Plaintiff denied thoughts of suicide,

homicide, hallucinations, or paranoia, as well as denying the use of drugs or

alcohol.  Plaintiff also reported issues sleeping.

On June 12, 2014, plaintiff saw Dr. Seaton for a therapy session.  (Tr. 537).

Plaintiff stated that he had been doing fairly well, but that the pain in his back had

increased, possibly because he had become accustomed to the pain medication.

Plaintiff also noted that he had recently mowed a lawn which aggravated his back.

Plaintiff stated that generally he had been sleeping well at night but that his

appetite had decreased because of pain.  Dr. Seaton suggested that plaintiff search

for jobs that would not aggravate his back and that he market the things he has experience with but aim his marketing at aspects of those jobs that would be reasonable with his pain limitations.  (Tr. 537).  On June 24, 2014, plaintiff reported to Dr. Seaton that things had been going well but that he had also had days where he felt down.  (Tr. 536).   Plaintiff stated that he had applied for a number of jobs but had not received any response.  Plaintiff also mentioned that he had six DWI's and had been told it would be futile for him to seek reinstatement of his license.

When plaintiff met with Dr. Seaton on July 8, 2014, he reported that he had recently filled in for someone mowing lawns and that he told the employer that he would be available long-term.  (Tr. 535).  Plaintiff stated that because of the new job opportunity he'd had no "down days."  Dr. Seaton and plaintiff discussed how self-determination tends to improve depression.   It was noted that plaintiff's mood appeared to be somewhat better since he had the prospect for a job.  Also on July 8, plaintiff was seen by Nurse Huff.  (Tr. 525).  Plaintiff described his pain as 6.5 out of 10.   Plaintiff had no abnormal psychomotor activity or involuntary movement.  It was also noted that plaintiff had no suicidal or homicidal thoughts.

On July 22, 2014, plaintiff was seen by Dr. Seaton who noted that plaintiff continued to remain generally upbeat and in a good mood.  (Tr. 534).  Dr. Seaton noted that plaintiff had not given up on finding work but seemed frustrated his previous job inquiry did not work out.  Plaintiff stated that he had had one manic episode where he could not sleep and felt that he had a lot of energy during the episode.  On August 6, 2014, plaintiff reported that he'd had no sleepless nights but

he would occasionally wake up for a few minutes and then fall back to sleep.  (Tr. 533).

On August 31, 2014, plaintiff told Dr. Seaton that his medication did not alleviate his pain.  (Tr. 532).  Plaintiff stated that he was sleeping well and denied having any sleepless nights.  Plaintiff stated that he had worked for a few days but that using a riding lawn mower hurt his back.  Plaintiff stated that he had five regular customers whose lawns he mowed approximately every other week.  Dr. Seaton noted that overall plaintiff was doing fairly well, however his pain problem continued and he had not found any significant help addressing his pain.  Plaintiff continued to work despite the pain, because of the financial contribution to his household.

On September 4, 2014, plaintiff reported to Dr. Seaton that he had worked that morning and would work the following morning as well.  (Tr. 531).  Plaintiff stated that he had one down day when he was diagnosed with hepatitis C.

On September 8, 2014, plaintiff was seen by Ifeanyi Izediuno. M.D., complaining of racing thoughts.  (Tr. 521-523).  Dr. Izediuno found that plaintiff was not psychotic, suicidal or homicidal.  It was noted that plaintiff was showing adequate compliance with his treatment without any adverse effects.  Dr. Izediuno concluded that plaintiff has multiple medical conditions associated with pain.

### 3.   Midwest CES

On May 4, 2013, a Consultative Exam Report was provided by Stephen Williamson, M.D., of Midwest CES.  (Tr. 504-508).  Plaintiff reported a history of carpal tunnel syndrome dating to 2011; his symptoms included pain, numbness, and swelling and described constant dull, achy, sharp, burning, and tingly pain.

Plaintiff stated that his pain intensity at the time of the exam was 6 out of 10; however he further stated that it was usually 10 out of 10.

Plaintiff also reported a history of osteoarthritis since 2011; his symptoms included pain, occasional numbness in the right arm and swelling. Plaintiff stated that medication helped, but moving made the problem worse. Plaintiff also noted that this problem affected his ability to work resulting from his difficulty moving around.

Plaintiff also reported a history of mental problems since the age of 16. (Tr. 504-505). He believed they arose after he impregnated a girl who then underwent an abortion. Plaintiff stated that he was diagnosed with bipolar disorder in 2013. Plaintiff reported trouble sleeping, lack of motivation, occasional crying spells, changes in appetite, and manic episodes every two weeks. Plaintiff also noted that he had frequent suicidal thoughts and had acted on those thoughts previously. Plaintiff reported that he was on medication and receiving psychiatric counseling to address his mental issues. Plaintiff stated that his ability to work is impacted because of a lack of motivation and because he "snaps very easily." (Tr. 505).

Plaintiff reported that he suffered night sweats, rashes, itching, lightheadedness, muscle pain, limitation of motion, paroxysmal nocturnal dyspnea, leg pains when walking, paresthesia, difficulties with memory, emotional problems and heartburn. He was able to button and unbutton a shirt, pick up a coin from a table, grasp a pen with the right hand and write, and lift, handle, and carry light objects. Plaintiff was able to touch his toes, squat, and rise with some difficulty. He could also rise from a chair and mount the examination table with some difficultly and lie into and rise from the supine position without difficulty. Plaintiff

could stand on his heels with some difficulty and stand on toes without difficulty. Plaintiff could also stand and hop on one foot bilaterally.

Dr. Williamson found that plaintiff's diagnoses of depression, bipolar disorder, carpal tunnel syndrome, and osteoarthritis were all supported in the medical record. He reported that plaintiff can sit continuously; can stand and walk limited by weakness in his hips; and can carry up to fifty pounds occasionally limited by weakness in his hips and by a weak grip.  Dr. Williamson further noted that plaintiff can reach, handle, and finger continuously, but had limited strength in his ability to handle and finger as supported by the weak handgrips he has bilaterally. Dr. Williamson noted that carpal tunnel release could improve some of plaintiff's symptoms.  Dr. Williamson also concluded that plaintiff could kneel, crouch, and crawl, occasionally limited by weakness in his hips.  Dr. Williamson stated that plaintiff could balance continuously and climb frequently limited by weakness in his hips.  Dr. Williamson also stated that plaintiff can see and speak without limitation; as well as tolerate heat, cold, and vibration without limitation.

### 4.      Psychological Evaluation

On May 15, 2013, plaintiff underwent a psychological evaluation performed by Thomas J. Spencer, Psy.D., to assist in the determination of Social Security disability benefits.  (Tr. 513-516).  Plaintiff's chief complaint was that he had carpal tunnel in both hands, degenerative osteoarthritis in his neck, depression, and bipolar disorder.  Dr. Spencer reviewed the Department of Social Services Disability and Adult Programs Services bill, the Claimant Allegations form, records from Rolla Neurology, records from Phelps County Regional Medical Center, records from Community Care Clinic, and the clinical interview as sources of information for the

evaluation.  He opined that plaintiff retained the ability to understand and remember simple instructions and the ability to engage in and persist with simple tasks. Dr. Spencer further opined that plaintiff demonstrated moderate to marked impairment in his ability to interact socially and in his ability to adapt to change in the workplace.

### III.  **The ALJ's Decision**

#### A. **October 17, 2013**

In the decision issued on October 17, 2013, the ALJ made the following findings with respect to plaintiff's application for disability insurance benefits.

1.    The plaintiff meets the insured status requirements of the Social Security Act through June 30, 2013.

2.    The plaintiff has not engaged in substantial gainful activity since November 9, 2008, the alleged onset date.

3.    The plaintiff has the following severe impairments: bilateral carpal tunnel syndrome, chronic back pain, cervical radiculopathy, and depression.

4.    The plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CRF Part 404, Subpart P, Appendix 1.

5.    The plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  He can lift and carry no more than 20 pounds occasionally and ten pounds frequently; stand and/or walk for six hours during an eight-hour workday, and sit at least two hours of an eight-hour workday.  The plaintiff would be precluded from working at or operating moving or dangerous equipment, and no fine manipulation.  Mentally, plaintiff's limitations in his ability to understand, remember simple instructions, carry out simple instructions and make judgments on simple work-related decisions are all categorized as none.  The plaintiff's limitation in his ability to interact appropriately with supervisors is categorized as mild.  The plaintiff's limitations in his ability to understand remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public and coworkers and respond appropriately to usual work situations and to changes in a routine work setting and are all categorized as moderate.

6.      The plaintiff is unable to perform any past relevant work.

7.      The plaintiff was born on July 16, 1968 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.      The claimant has a limited 10th grade education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the plaintiff has transferable job skills.

10.     Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform.

11.     The plaintiff has not been under a disability, as defined in the Social Security Act, from November 9, 2008, through the date of this decision.

(Tr. 122-141).

### B. January 15, 2015

In the decision issued on January 15, 2015, the ALJ made the following findings with respect to plaintiff's application for disability insurance benefits.

1.      The plaintiff meets the insured status requirements of the Social Security Act through June 30, 2013.

2.      The plaintiff has not engaged in substantial gainful activity since January 27, 2012, the alleged onset date.

3.      The plaintiff has the following severe impairments: depression, substance abuse disorder, carpal tunnel syndrome, and disorder of the back/arthritis.

4.      The plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.      The plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  He can lift and carry 20 pounds occasionally and ten pounds frequently; stand and/or walk for six hours and sit for six hours during an eight-hour workday; can occasionally climb, stoop, kneel, crouch, or crawl; is limited to jobs that do not require constant repetitive hand

movements; should avoid unprotected heights and hazardous moving machinery; and is limited to simple work that involves no more than occasional interaction with the public.

6.  The plaintiff is unable to perform any past relevant work.

7.  The plaintiff was born on July 16, 1968 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.  The claimant had a limited education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the plaintiff has transferable job skills.

10. Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The plaintiff has not been under a disability, as defined in the Social Security Act, from January 27, 2012, through the date of this decision.

(Tr. 16-30).

## IV.  **Legal Standard**

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the plaintiff was not disabled." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997). "'Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm

the decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a plaintiff must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three requires the plaintiff to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the plaintiff does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] plaintiff's RFC [is] based on all relevant

evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." *Moore*, 572 F.3d at 523 (quotation and citation omitted).

In determining a plaintiff's RFC, the ALJ must evaluate the plaintiff's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the plaintiff's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the plaintiff's work history; and (7) the absence of objective medical evidence to support the plaintiff's complaints." *Buckner*, at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a plaintiff's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" *Id.* (quoting *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the plaintiff's complaints. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); *Beckley v. Apfel*, 152 F.3d 1056, 1059–60 (8th Cir. 1998).

At step four, the ALJ determines whether a plaintiff can return to her past relevant work, by comparing the RFC with the physical and mental demands of a plaintiff's past work. 20 C.F.R. § 404.1520(f). The burden at step four remains with the plaintiff to prove her RFC and establish that she cannot return to her past

relevant work. *Moore*, 572 F.3d at 523; accord *Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a plaintiff cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the plaintiff maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

If the plaintiff is prevented by her impairment from doing any other work, the ALJ will find the plaintiff to be disabled.

**V.   Discussion**

Plaintiff first argues that the ALJ erred by failing to properly support the RFC determination by pointing to at least "some medical evidence" to support his conclusions. *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) ("To properly determine a claimant's residual functional capacity, an ALJ is therefore required to consider at least some supporting evidence from a medical professional"). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir.2001)).  However, "in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively."  *Id*.  Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.  *Id*. (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).  Plaintiff notes that the medical opinions addressing plaintiff's abilities include a treating source opinion, two examining

source opinions, and a non-examining source opinion and cites *Lauer v. Apfel* for the proposition that the record must still contain some medical evidence to support the ALJ's conclusions regarding the plaintiff's manipulative impairments.  245 F.3d 700, 704 (8th Cir. 2001).  Plaintiff argues that when the decision of the ALJ is unclear as to the medical basis for his assessment of the degree to which plaintiff's impairments affect his RFC, the ALJ's decision is not supported by substantial evidence and must be remanded.  Plaintiff specifically contends that the medical evidence shows a greater degree of limitation than provided for by the ALJ.

Here, the ALJ's opinion references a number of medical sources in support of his RFC determination.   The ALJ noted, and the record reflects, that electrophysiological studies, done by Dr. Choudhary, provided evidence of moderate, right greater than left carpal tunnel syndrome and sensorimotor polyneuropathy in plaintiff's lower extremities secondary to alcohol abuse.  (Tr. 25). The ALJ further noted that plaintiff presented with decreased pinprick sensation and reduced hand grip strength during treatment sessions with Dr. Choudhary from January 2012 to March 2013.  (Tr. 25).  The ALJ also noted that while plaintiff had a bothersome level of physical pain and psychological distress present, the record does not documents pervasively abnormal medical signs of the seriousness one would reasonably expect given the plaintiff's allegations.  (Tr. 26).  The ALJ noted that Dr. Williamson recognized that plaintiff had mild strength deficits in multiple muscles and joints, but failed to assess whether plaintiff had a commensurate limitation with regard to lifting and carrying.  (Tr. 27).  The ALJ further noted that plaintiff's deltoid, hip flexor, ankle dorsiflexion, finger spread and grip strength were all mildly reduced.  (Tr. 27).   The medical report from the consultative exam

administered by Dr. Williamson supports this conclusion as plaintiff was generally able to button and unbutton a shirt, pick up a coin from a table, grasp a pen with the right hand and write, and lift, handle, and carry light objects.  (Tr. 507-511). The ALJ also noted that the record does not document any more significant abnormalities that would be consistent with the plaintiff's allegations, for example, the ALJ found that the plaintiff had not demonstrated more than a mild loss of strength reasonably consistent with his alleged difficulty holding objects or inability to lift more than five pounds.  (Tr. 25-26).  The ALJ also noted that plaintiff's treatment was limited to medical management which was consistent with the mild to moderately abnormal clinical findings documented in the case record.  (Tr. 26). This medical evidence supports the ALJ's assessment of the claimant's ability to function in the workplace. Plaintiff also argues that the ALJ relied upon his own inferences in determining plaintiff's RFC and that an additional medical opinion should be sought.   However the ALJ expressly considered and used the medical evidence in the record in formulating his RFC determination which is all that is required in an administrative decision.  *See* 20 C.F.R. § 404.1527(b) (stating that the ALJ "consider[s] the medical opinions in [the] case record together with the rest of the relevant evidence").   Furthermore, it is the plaintiff's burden, and not the ALJ's burden, to prove the plaintiff's RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Anderson v. Shalala,* 51 F.3d 777, 779 (8th Cir.1995)). In light of the facts, observations, and medical conclusions which bear directly on the extent of plaintiff's ability to use his hands to function, the Court finds that the ALJ's RFC assessment is supported by substantial medical evidence.

Plaintiff next argues that the October 16, 2015 evidence provided by Dr. Choudhary, which the ALJ was unable to consider, undercuts the evidence supporting the ALJ's decision.  Plaintiff argues that because Dr. Choudhary's second opinion came after the ALJ's decision, the ALJ's opinion is not supported by substantial evidence and that further medical evidence is needed.  In the post-hearing opinion, Dr. Choudhary opined that plaintiff suffered from manipulative limitations and that he would need 10- to 15-minute breaks throughout the work day due to pain, paresthesia, numbness, and chronic fatigue.  Dr. Choudhary determined that plaintiff could lift up to ten pounds constantly, twenty pounds frequently, and fifty pounds rarely.  Dr. Choudhary also determined that plaintiff could finger and feel constantly and could reach and handle objects frequently.

After reviewing the new evidence from Dr. Choudhary, the Court finds that it does not undermine the ALJ's decision or otherwise require remand.  The Appeals Council indicated that it considered the new evidence provided by Dr. Choudhary and determined that the information did not provide a basis for changing the ALJ's decision.  The Court's role is to determine whether the ALJ's decision "is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made." *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000).  Here, the ALJ's decision is not undermined by the new evidence because Dr. Choudhary's new opinion does not contradict the ALJ's conclusions.  The ALJ precluded plaintiff from work requiring constant, repetitive hand movements, whereas Dr. Choudhary opined that plaintiff could frequently reach and handle, and constantly finger and feel.  The ALJ properly considered all of the medical and other relevant evidence of record in making his RFC determination,

including Plaintiff's descriptions of limitations, observations of treating and examining physicians and others, and medical records including any observations therein. Thus, the ALJ's RFC is supported by medical evidence that is sufficiently clear to allow for an understanding of how Plaintiff's limitations function in a work environment.  Dr. Choudhary's additional evidence was less restrictive than the RFC determined by the ALJ. Furthermore, the ALJ's determination of limitation was not contradicted by Dr. Choudhary's additional report.  Therefore, substantial evidence supports the RFC determination.

Plaintiff also argues that whether he could perform "no constant, repetitive hand movements" or occasional handling, fingering, and feeling is a material question because the vocational expert in the December 2, 2014 hearing testified that a limitation to occasional handling, fingering, and feeling precluded all competitive work.  The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.  *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) (quoting *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011)).  Here, the ALJ posed both limitations to the vocational expert and ultimately determined that plaintiff could perform no constant, repetitive hand movements after consideration of the record.  The ALJ then relied on the testimony of the vocational expert to determine that plaintiff could perform work existing in significant numbers in the national economy.  Because the ALJ's finding of plaintiff's RFC is supported by substantial evidence, the ALJ's use of the hypothetical question was proper and the vocational expert's response constituted substantial evidence that plaintiff could perform work in the national economy.

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed.**

A judgment in accordance with this Memorandum and Order will be entered separately.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 21st day of July, 2017.